### FLINT, EDDY & CO. v. STANDARD ROPE & TWINE CO.

(Supreme Court, Appellate Division, First Department. June 8, 1900.)

1. SALES—REJECTION OF GOODS—ACQUIESCENCE.
   A seller of goods rejected as not in compliance with the contract of sale, who does not object to the rejection, is bound thereby, notwithstanding he had no knowledge as to whether the goods answered the requirements of the contract, as it was his duty to investigate before acquiescing.

2. SAME—TENDER OF PERFORMANCE—EVIDENCE.
   A quantity of hemp of a certain quality was ordered. The first two cargoes were rejected by the purchaser as not in compliance with the contract, and the vendor made no objection as to one, and, pending investigation as to the other, fulfilled the contract in part from other cargoes. Two experts (one representing the vendor) examined the rejected cargoes, and found hemp answering the terms of the contract, but did not state the quantity. Bales of the rejected cargoes answering the terms of the contract were not set apart from those which did not. The vendor sold the rejected cargoes at auction, at a loss from the contract price, after notifying the vendee to take from the cargoes sufficient to fulfill the contract, and after his refusal so to do. Held, that the purchaser was not liable for the loss from the contract price, since there had been no sufficient tender of bales answering the terms of the contract.

Appeal from special term, New York county.

Action by Flint, Eddy & Co. against the Standard Rope & Twine Company. From a judgment dismissing plaintiffs' complaint, they appeal. Affirmed.

Argued before PATTERSON, P. J., and INGRAHAM, McLAUGHLIN, and HATCH, JJ.

Benjamin J. Downer, for appellants.
John L. Cadwalader, for respondents.

HATCH, J. On October 17, 1896, the parties to this action entered into a written agreement through Ira A. Kip & Co., brokers, acting for both parties, whereby the defendants agreed to purchase of the plaintiffs 7,000 bales of current quality Sisal hemp, to arrive at the port of New York; 3,500 bales to be shipped at Progresso, per steamer or steamers, during the month of December, 1896, and 3,500

bales during the month of January, 1897; the names of the steamers to be given by the plaintiffs as soon as known to them. The sale was for cash, payable on delivery. "Hemp to be sound and in good order, and to be taken by buyers from alongside the steamers as discharged, at actual gross weight. Any inferior, red (not exceeding 5 per cent. of each), damaged, and pickings to be taken by the buyers at a fair allowance from the above price, to be decided by the undersigned." Ira A. Kip & Company, Brokers. Pursuant to the terms of this agreement, the first shipment was made by the steamer Habana, which carried 1,710 bales; and arrived at the port of New York on January 4, 1897. Immediately upon the arrival of the steamer, the hemp was examined by the brokers who made the contract, and was rejected by them as being of an inferior quality, and not in compliance with the terms of the sale. It is claimed by the plaintiffs that the brokers were not authorized to determine whether the hemp answered the requirements or not; that they were not made arbiters between the parties to make such determination. That part of the contract which we have quoted is somewhat ambiguous upon this subject. It is evident that it can be construed to mean that the brokers were to determine whether the hemp contained "any inferior, red (not to exceed 5 per cent. of each), damaged, and pickings"; and the fact that the defendants sent their own agent to make an examination of the hemp upon its arrival is some evidence that their construction of the agreement did not constitute the brokers the sole arbiters in determining whether the hemp answered the requirements of the contract, so as to make the brokers' determination conclusive. But, however this may be, and whatever be the correct construction of the contract in this respect, we do not regard the determination of such question as essential to the disposition of this case, as we think it is controlled by another principle of law, not involved therein. Immediately upon the rejection of the cargo of the Habana, the brokers notified the parties of such fact; and the defendants after such notice wrote the plaintiffs of the result of the examination by the brokers, and of their own examination, and refused to accept the hemp, as not being in compliance with the contract. On receipt of this letter the plaintiffs notified the defendants that they would supply 2,750 bales from a shipment made by the steamer Greetlands, to make up for the shipment already rejected. No claim was made by the plaintiffs at this time that the hemp rejected answered the terms of the contract. On the contrary, they acquiesced therein, and within a few days offered the same shipment of hemp to the defendants, through the same brokers, at a less price than that for which the contract called, which offer was declined by the defendants. Prior to the arrival in the port of New York of the steamer Greetlands, the defendants were notified by the brokers that the plaintiffs would fulfill their contract by delivering from the Greetlands, then due in New York, about 2,750 bales; by the Glen Mavis, shortly sailing for New York, about 1,500 bales; and the Mathilda, due at Boston about February 1st, 2,800 bales. Upon the arrival in the port of New York of the Greetlands, on January 19th, the cargo was examined by the brokers, and was by them rejected as not being in compliance with

the contract, and the brokers notified the parties of such determination; and the defendants thereupon notified the plaintiffs of such fact, and that they refused to accept the hemp, as not answering the requirements of the contract. In reply to this notification the plaintiffs stated that they would make compliance with the contract, pending investigation, from the cargoes of the Glen Mavis and the Mathilda. Of the two last-named cargoes, the defendants accepted 3,938 bales, and 20 bales were sent from the cargo of the Greetlands to be put through the defendants' machine, in order to test its quality, and they were also retained by the defendants; thus leaving 3,042 bales short of the amount required to fulfill the contract. On the last of the February following, the brokers wrote the defendants that they had upon that day re-examined the cargo of the steamer Habana, which had in the meantime been stored, and that they thought a large part of the bales would pass as current; and on March 8th following, the plaintiffs wrote the defendants that the cargoes of the steamers Habana and Greetlands answered the requirements of the contract, and requested them to take the bales necessary to complete the same and pay therefor. This the defendants declined to do. Thereupon, after some correspondence, in which the plaintiffs notified the defendants of their intention to sell the same if the latter did not take and pay therefor, the plaintiffs sold 3,041 bales at auction, the sale resulting in a loss from the contract price of $6,853.20, and it is this difference which the plaintiffs seek to recover in this action.

It was conceded upon the trial that there was not strict compliance with the contract upon the part of the plaintiffs, but the evidence is sufficient from which the jury would have been authorized to find that the defendants waived strict compliance, and would have been bound to take from any shipment upon the four steamers the number of bales for which the contract called. It clearly appears, however, that the plaintiffs acquiesced in the report of the broker, in rejecting the hemp shipped by the steamer Habana as not being in compliance with the contract, and in the action of the defendants upon this report, based upon their own examination. And while, in answer to the notification by the defendants of the rejection of the cargo of the Greetlands, they replied that pending investigation they would make compliance by other shipments, they did not make any investigation of such cargo until March following, or in any respect claim that the defendants were bound to take it in fulfillment of the contract. The conclusion that the plaintiffs acquiesced in the rejection of the hemp is stoutly contended against, for the reason that, as they had no knowledge of the fact that the hemp answered the requirements of the contract, therefore there could be no acquiescence in a claim in respect to the basis of which they were ignorant. But their attitude in this respect is not in any wise to be determined by their knowledge or lack of knowledge or intention. They made no objection to the claim, and became bound thereby. The failure to investigate and determine the fact was their own fault, for which the defendants were in no wise responsible. Had the defendants at such time refused to further continue negotiations under the con-

tract, they would have acted within their strict legal rights, and been under no liability whatever to the plaintiffs. It appears, however, that the defendants subsequently expressed a willingness to take from the plaintiffs current Sisal hemp in fulfillment of the contract, and these negotiations were of such a character that the contract continued to remain in force, so far as to permit the performance thereof by the plaintiffs within a reasonable time. It is to be borne in mind, however, that, at all of the times when these negotiations were had, the defendants' claim was that the plaintiffs were in default; and, with knowledge of such condition, the latter acquiesced therein. In this view, a duty was devolved upon the plaintiffs, if they sought to make compliance with the contract by subsequent act, to make such act clear and unequivocal, so that the defendants would be clearly advised of the hemp which the plaintiffs claimed they were required to take, and be given an opportunity to receive the specific bales and pay therefor. The crucial question, therefore, upon this branch of the controversy, is, did the plaintiffs by any act of theirs succeed in changing the relative position of the parties? In other words, did the plaintiffs' subsequent act relieve them from their admitted default, and place the defendants in default? If it did, then the plaintiffs' complaint was improperly dismissed. Upon this subject the proof is that Rosso, a representative of the plaintiffs, and one Heydrich, both experts in hemp, examined the cargoes which were taken from the Habana and Greetlands, and both testified that they found hemp answering the terms of the contract. Rosso was asked whether the hemp contained more than 5 per cent. of red, damaged, and pickings, in it, and answered: "That we could not ascertain. That could only be ascertained by counting the bales. When we came to deliver the hemp, we found less than 10 per cent." At the time of this examination the hemp was in storage, and that which the plaintiffs required the defendants to take was mingled with a considerable number of other bales, which it was not pretended should be taken. No separation was ever made of the hemp which it was claimed answered the requirements of the contract, and after this examination, and at the time when the plaintiffs notified the defendants to take and pay for the same, such hemp still remained, and continued to be, mingled with the other hemp, and was never separated therefrom prior to its removal and sale. It is plain, therefore, that there never arrived a time when the plaintiffs were able to say to the defendants, "There are the specific bales of hemp to answer the requirements of our contract with you, and which we now demand that you take." And there was no time prior to the auction sale when specific bales of hemp were set apart, which the defendants, had they desired, could take, and make payment in fulfillment of the contract. We are therefore of the opinion that there was no act of the plaintiffs which placed the defendants in default under their contract, and that the hemp was not tendered in such manner as to require the defendants to take and pay therefor. Groninger v. Crocker, 62 N. Y. 151; Benj. Sales, § 689; Foot v. Marsh, 51 N. Y. 288; Arn. Sales, § 325; Macomber v. Parker, 13 Pick. 175, 183.

There is some question as to whether the subsequent examination disclosed a sufficient number of bales among those examined to answer to the requirements of the contract. Certainly Rosso and Heydrich did not ascertain this fact, and, while it is possible to find from Rosso's testimony that the subsequent results showed that there existed a sufficient quantity of current hemp to answer the requirements, yet such fact was not determined at the time; and it was from such act of determination that the defendants' liability was established, or it was not established at all.

We are therefore of the opinion that, after the rejection of the two cargoes, the plaintiffs were bound to make tender of specific hemp sufficient to answer the terms of the contract, before the defendants could be placed in default. In this regard there was failure so to do, for which reason the complaint was properly dismissed. The judgment should therefore be affirmed, with costs. All concur.